IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

NIGEL NOLL,

               OPINION AND ORDER

       Plaintiff,

                20-cv-293-bbc

    v.

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,
DR. B. BRADFORD BROWN AND
DR. HALEY VLACH,

       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

    In this lawsuit brought under Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1973, plaintiff Nigel Noll, a former Ph.D. student in the University of Wisconsin's Department of Educational Psychology, contends that he was the victim of both discrimination and retaliation on the basis of his disability when he was denied a teaching assistant position, his longtime advisor withdrew and department faculty declined to allow him to pursue a Ph.D.  Plaintiff has sued his former advisor, Haley Vlach, Department Chair B. Bradford Brown and the University of Wisconsin System Board of Regents, which governs the Educational Psychology Department.  Wis. Stat. § 36.09 (establishing that the board governs the schools and programs within the university).  He asks the court to order his reinstatement to the graduate program and to award him damages.

    Defendants have moved for summary judgment, dkt. #19, which will be granted.  As

plaintiff now concedes, individual defendants Vlach and Brown are not proper defendants in a case brought under the ADA or the Rehabilitation Act; accordingly, these defendants will be dismissed without further discussion.  Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303, 783 F.3d 634, 644 (7th Cir. 2015) (individuals are not "public entity" that can be sued under ADA or Rehabilitation Act).  As for the Board, plaintiff has failed to adduce evidence sufficient to permit a reasonable jury to infer that the department took any of the actions it did because of plaintiff's disability or because he complained about disability discrimination.  Rather, the record demonstrates that the department had legitimate concerns about plaintiff's ability to succeed as a Ph.D. student and about his passion for his work.

One preliminary evidentiary matter requires discussion.  In response to defendants' proposed facts in support of their summary judgment motion, plaintiff offered primarily his own version of events, often supplemented with argument.  Instead of submitting a separate, sworn affidavit setting out these facts, plaintiff provided a sworn statement attached to his responses in which he affirmed that the facts set forth in his responses were "true and correct" to the best of his knowledge.  See dkt. # 29, at 80.  In their reply, defendants noted that plaintiff's approach failed to comply with the court's instructions for responding to summary judgment motions, and urged the court to strike responses that were inappropriately argumentative or not plainly based on personal knowledge.

Three weeks later, plaintiff filed a motion for leave to file a supplemental declaration, which he purported to offer solely for the purpose of clarifying the scope of his previous

sworn responses.  Dkt. #36.  As defendants point out, however, the declaration does not simply clarify plaintiff's initial responses, but expands upon them.  To give one example, plaintiff now identifies a specific graduate student in Vlach's lab as a potential comparator, whereas his initial responses referred only vaguely to "other" graduate students in the Educational Psychology program.  Plaintiff offers no reason why he could not have provided this information within his summary judgment response deadline.  Because he has not shown excusable neglect and defendants would be unduly prejudiced if plaintiff's untimely declaration were allowed, I am denying plaintiff's motion.  As for plaintiff's verified responses, they are accepted only to the extent they appear to be based on personal knowledge.  I have disregarded statements that are immaterial or unduly argumentative.

The following facts are undisputed unless otherwise noted.

## UNDISPUTED FACTS

### A.  The Department's Graduate Program

At all times relevant to this lawsuit, plaintiff Nigel Noll was a graduate student in the Human Development program in the University of Wisconsin's Department of Educational Psychology ("the department").   Plaintiff matriculated in the fall of 2014 with a goal of earning a Ph.D. from the program and becoming a professor at an R1 university.[1]

---

[1]A "Research 1" or "R1" university "is a category that the Carnegie Classification of Institutions of Higher Education uses to indicate universities in the United States that engage in the highest levels of research activity."  See https://en.wikipedia.org/wiki/research_I_university (Nov. 8, 2021).

Graduate students in the Department of Educational Psychology are required to work with a faculty member who serves as the student's advisor and chairs the student's master's degree committee. The advisor is usually a faculty member whom the student has requested on his or her application or who shares the student's research interests, although a student may change advisors at any time after arriving on campus.

The department requires its Ph.D. students to first obtain a master's degree, which requires the student to develop, investigate, and defend a formal research thesis before a Master's Committee. In addition to deciding whether to approve the master's thesis, the committee decides whether to recommend the student to the faculty for admission to the Ph.D. program. However, formal approval for any student to continue with his or her Ph.D. after successful completion of a master's degree is determined by a formal vote of the faculty.

A student's enrollment in the department may be terminated if the faculty does not approve admission to the Ph.D. program or if the student cannot identify a faculty member to serve as an advisor. Generally speaking, the department expects its full-time graduate students to complete and defend their master's thesis within six semesters and to obtain a Ph.D. at the end of the student's fifth year, although not all students do so.

Students in the department have multiple potential funding sources, including working as a teaching assistant (TA), project assistant (PA), research assistant (RA), or qualifying for a fellowship. However, the department does not guarantee funding to all students at the time of matriculation or throughout their entire graduate program and encourages its students to take initiative and be flexible in finding funding. TA positions are

awarded on an annual basis and are usually awarded to students with strong academic records who are in their early rather than later stages of their graduate program.  Students in the department are often eligible for TA positions in other departments and are advised to routinely check with other departments for available TA positions for which their backgrounds are suitable.

### B.  Plaintiff's Performance as a Graduate Student

Plaintiff  began his graduate studies in the fall of 2014, with assistant professor Haley Vlach, Ph.D., as his advisor.  Vlach was Principal Investigator and Lab Director of the Learning, Cognition, & Development (LCD) lab at UW-Madison, which studies young children's memory, word learning, categorization and conceptual development.  Plaintiff worked as a graduate student in the LCD lab and reported directly to Vlach.  Plaintiff also obtained the assistance of Chuck Kalish, Ph.D., who, like Vlach, also studied children's learning and categorization and whose lab provided plaintiff additional research opportunities.  Kalish served as an informal co-advisor to plaintiff and often joined Vlach on emails and meetings with plaintiff.

Vlach met with plaintiff on an approximately weekly basis, helping him develop experiments and teaching him how to run experiments in her lab.  Vlach also worked to help plaintiff publish journal articles, deliver presentations at conferences and secure opportunities and experiences in which he expressed interest.  For example, after plaintiff indicated an interest in teaching, Vlach emailed another professor in the department and

asked how plaintiff could apply to serve as a TA, and forwarded him emails about open TA positions.  Vlach, along with Kalish, actively reviewed plaintiff's work and plans, offering feedback to help him prioritize his time and efforts to achieve a satisfactory work product.

In July 2016, plaintiff presented and received approval for his proposed master's thesis.  In a letter dated November 18, 2016, the department informed him that he was making satisfactory progress in its program, and recommended that he defend his thesis in the spring/summer of 2017.

In April 2017, Vlach asked the graduate students in her lab to update her on their progress.  In an email to Vlach, plaintiff identified his top priority as preparing to teach a class in summer 2017, with his next priority to work on data collection for his master's, a task he hoped to complete by May or June.  Plaintiff said he planned to write his thesis while he finished data collection and that he hoped to revise and defend his thesis by late August 2017.

On April 27, 2017, Vlach responded, agreeing that teaching should be plaintiff's main priority, insofar as he had a "hard deadline" and was behind schedule.  As for plaintiff's goals regarding his master's thesis, Vlach asked him to develop a week-by-week timeline for her review so she could determine whether it was reasonable.  After plaintiff provided more details, Vlach agreed that his plan looked reasonable, but advised plaintiff that he should not collect additional data until he had time to appropriately train his research assistants.  Vlach and  Kalish had previously cautioned plaintiff against rushing to meet the timeline, saying they preferred quality over speed.

Plaintiff missed his goal of completing his thesis by August 2017.  In a letter from the chair of the department, B. Bradford Brown, on October 19, 2017, plaintiff was advised that he was making satisfactory progress towards a degree, but he should aim to finish his thesis by February 2018 to avoid falling behind.

Between July 2017 and January 2018, plaintiff sent various documents and drafts related to his thesis paper to Kalish and Vlach for feedback.  On August 6, 2017, Vlach received a copy of an email from Kalish to plaintiff noting that plaintiff was "still missing a clear test of [his] hypotheses" for his master's project.  On October 16, plaintiff sent Vlach and Kalish a first draft of his introductory section for their review.  Vlach responded on October 17, providing feedback on how to improve his work and topics to be discussed at their upcoming meeting.

On November 6, 2017, plaintiff emailed Vlach and Kalish the "start of a draft of [his] introduction" and some figures, noting that his draft was "not far along" but showed the framing he planned on using.  Vlach replied that same day, noting that since plaintiff's draft was not complete, she was going to "send [him] the same type of feedback as last time."  Vlach provided a number of suggestions, including reminding him of the general structure for the introduction that they had discussed at their last meeting.  The most important feedback she offered was that he needed to spend time on new writing instead of perfecting things he had already written, noting that the draft contained a lot of the same writing he had previously submitted but was "polished up a bit."  Vlach told plaintiff that she could not provide him good feedback for the next steps until he wrote new sections of the paper.

7

Throughout November and December of 2017, Vlach and Kalish continued to meet with plaintiff, answer questions and provide feedback on his written drafts of portions of his thesis.

On January 11, 2018, plaintiff provided Vlach and Kalish another draft of his introduction section. On January 12, Vlach provided plaintiff written feedback on the draft. She said that overall, it was stronger than the previous draft, but still required a "significant amount of work" to improve the writing. Among other things, she advised him to avoid re-writing sections of his thesis that did not need fixing and focus his efforts on the sections that needed the most work. She also noted that the introduction was too long, his draft contained statements that were too strong or were oversimplifications, and that his research and hypotheses sections needed the most work.

On January 13, 2018, Vlach received an email from Kalish noting that plaintiff appeared to be spinning in a circle rather than making forward progress and that they needed to speak with him. Vlach agreed, noting that plaintiff had been working on the introduction to his thesis for more than three months. She suggested that at their next meeting, they ask plaintiff why he thought it was taking him so long to draft his thesis. She added that, regardless of how plaintiff responded, they needed to ask him "whether he is enjoying it/spending a lot of time on it/etc., because if he isn't, that probably means he doesn't love it, which means he shouldn't be in graduate school."

### C.  January 23, 2018 Meeting With Vlach and Kalish

On January 23, 2018, Kalish and Vlach met with plaintiff and raised their concerns. The parties dispute how plaintiff responded:  Vlach says plaintiff responded that he was not enjoying research as much as he thought he would, he did not see himself being happy as a tenure-track research professor or senior scientist, and he was instead interested in working in higher education administration.  Plaintiff denies saying that he did not enjoy research or would not be happy as a professor, and says he mentioned a career in higher education administration only as a backup plan.

After their January 23 meeting, Kalish and Vlach deemed their discussion with plaintiff to be a "big victory."  Vlach considered their meeting a victory because they now finally understood why plaintiff was struggling to complete his thesis.  However, Vlach told Kalish that she was a "little skeptical of [plaintiff's] interest in administration" and that it felt like plaintiff was "just picking something else in academia rather than thinking through his interests/strengths[.]"  Vlach said the "next victory will be getting him to figure that out." Kalish and Vlach both sent plaintiff emails with suggestions and contact information for individuals in higher education administration positions with whom he could speak to learn more about their careers.

On January 27, 2018, plaintiff sent Vlach a copy of on an email to Kalish, thanking Kalish for recommending that he get in touch with an individual named Aaron Brower. Plaintiff said he had already been in touch with Brower, who had provided advice as well as another connection to someone who was looking for a project assistant that semester.

Plaintiff asked Kalish how he would like him to respond to the offer.  Kalish replied that the project assistant job might be a better fit for plaintiff's career goals, and that, depending on what the position entailed, they might be able to figure out how to split plaintiff's time between Kalish's project and that position.

D.  February 2018:  Plaintiff Discloses His Disability and Requests Accommodation

Plaintiff was diagnosed with bipolar disorder and Attention Deficit/Hyperactivity Disorder in approximately 2005.  On February 7, 2018, plaintiff emailed Vlach and Kalish, informing them that the university's disability resource center had found him eligible for certain accommodations and apologizing that he had not given them this information earlier. Plaintiff said he had recently seen his doctor, and "this has now become something I need to discuss with both of you."  Prior to receiving this email, neither Vlach nor Kalish was aware that plaintiff had a disability.  At a meeting on February 15, plaintiff informed them that he had a disability, he was starting a new medication and it would take him about two weeks to get used to it.  However, he did not discuss anything specific about his disability, including his symptoms or diagnosis, and neither Kalish nor Vlach asked him for such details.  Plaintiff asked for an extra two weeks to complete his master's thesis.  Kalish and Vlach both agreed to provide the extra time to plaintiff and told him to let them know if there was anything else he needed.  Plaintiff did not request any additional accommodations from the department.

E. <u>Plaintiff's Career Plan and March 13, 2018 Meeting with Vlach and Kalish</u>

Meanwhile, plaintiff continued to discuss his future plans with Vlach and Kalish.  On March 5, 2018, he emailed them a document setting forth his career plan, listing his career goal as "University Administrator in Academic Affairs."  Plaintiff said he still planned to earn his Ph.D. from the department and continue his current research in categorization in young children.  Plaintiff said he enjoyed research, but would not enjoy a job in which teaching was prioritized over research.  He further said he would not be happy teaching while trying to accomplish research on the side, such as at an R2 university, (that is, one with high research activity) and he would not enjoy being a research scientist conducting someone else's research.  He said that "although he [would] not be an R1 professor," he hoped Vlach and Kalish would find his proposed career path to be satisfactory.   In a footnote, plaintiff said he had "never wavered" in working towards a Ph.D. in educational psychology, despite "insistence that [he] should consider other options."  Plaintiff concluded by noting that "administration in higher education is the plan."

Vlach was confused by this document.  In her view, plaintiff's stated interest in higher education administration and career goal of becoming a university administrator in academic affairs seemed at odds with his statement that he planned to continue to study categorization in young children and pursue a dissertation topic aligned with Vlach and Kalish's research, even though he did not want to become a professor or senior scientist in the field.  Further, plaintiff had seemed appreciative of Vlach and Kalish's previous efforts to help him on the path towards a career in university administration.

11

Vlach and Kalish met with plaintiff on March 13 to discuss his career plan document and questions he had about his master's thesis.[2]  Plaintiff said that after he completed his master's degree, he wanted to begin preparing for his preliminary exams and continue to build on the research he had already been doing in Vlach's lab.  Vlach questioned what plaintiff's career goal was, noting that she understood from his career plan document that his long-term goal was *not* to study categorization as he had been doing in Vlach's lab. Plaintiff said his long-term goal was to work in a university provost's office and to engage in institutional research, such as understanding how academic programs are instituted, understanding student success and dropout rates, and understanding how students are prepared for life beyond the university.  Vlach and Kalish both advised plaintiff that he should choose a Ph.D. research topic related to that goal, rather than continuing to study categorization.  Plaintiff responded that his reason for continuing with his research in categorization was because Vlach worked in that field, he worked in Vlach's lab, and he found it interesting.  Kalish and Vlach both told plaintiff that he should not anchor his preliminary exam topic and subsequent work towards a Ph.D. to what his advisor does, but should pick something anchored to his own long-term goals.

Kalish and Vlach told plaintiff that if he wanted to graduate with a Ph.D. in the department, he could do so by having them serve as his advisors on paper, but that he would need a primary mentor who was an expert in research relating to higher education

---

[2]Plaintiff recorded this meeting on his cell phone, which was in his pocket, and produced it to defendants.  Defendants submitted this recording, along with two other recordings made by plaintiff of meetings with Vlach on May 23, 2018, and Brown on June 20, 2018, in support of their motion for summary judgment. Vlach and Brown have attested to the accuracy of the recordings.

administration.  Alternatively, they told plaintiff that he would have to be comfortable developing that research expertise on his own, but stressed that was not ideal and it would be better if he found someone to mentor him.  Vlach encouraged plaintiff to think about who could serve as his mentor, explaining that it could be anyone at the University of Wisconsin with a Ph.D., and both Vlach and Kalish suggested the names of several people who might fill this role.  Vlach reiterated that she was supportive of plaintiff's career goal, and would do what she could to help him, but he was blazing his own path in a field outside her area of expertise and would have to do most of the legwork on his own.

The remainder of the March 13, 2018 meeting centered on plaintiff's questions about funding and TA positions for the 2018-19 academic year.   Vlach told plaintiff that, given his interest in higher education administration, the best funding he could obtain would come from doing work or research in that particular field.  Vlach told plaintiff that he could apply for a TA position in the department, and that he should apply soon because the deadline was coming up.  However, Vlach and Kalish noted a number of reasons why plaintiff was unlikely to obtain a position:  he had already served as a TA for the department twice, he had a good history of funding, and was behind schedule on his master's thesis.  While students were supposed to defend their thesis in their third year, plaintiff was now nearing the end of his fourth year.  They encouraged him to seek out as many funding opportunities as possible, including looking outside of the department.

 Vlach concluded the March 13, 2018 meeting by reiterating that the "ball was in [plaintiff's] court."  She said she would do what she could to support him, but there was a

13

lot of work he needed to do, including finding a primary mentor who could support him in his long-term goals.

Plaintiff applied for a TA position in the department.  On May 23, 2018, Vlach informed him that he was "ranked toward the bottom of the waitlist" for a position because he was behind the timeline for the program, had already been given teaching experience, and unspecified "other factors."  However, by July 2018, plaintiff had secured an offer to TA a psychology class with Allyson Bennett in the psychology department.

F.  May 23, 2018:  Plaintiff's Thesis Defense and Follow Up Meeting with Vlach

On May 23, 2018, plaintiff defended his master's thesis.  Kalish was not in town that day, so the only committee members present were Vlach and Dr. Rosengren, a faculty member in the psychology department.  After his thesis defense, plaintiff met with Vlach in her office.

Vlach said plaintiff had done a good enough job to pass his defense and earn his master's, but his presentation lacked clarity.  Vlach explained that plaintiff had discussed too many theories that did not apply directly to his work and it seemed to become "mush."  Plaintiff agreed that he had struggled with framing his presentation.  Vlach went on to address broader concerns she had about plaintiff's performance as a graduate student, explaining that he had a hard time applying theory to his own work, didn't seem to be improving, and Vlach was unsure what to do about it.  In Vlach's opinion, plaintiff was at the stage in his program where he should be defending his position at preliminaries, but

14

instead his research skills were at the level of a second-year, first-semester graduate student.

Apart from plaintiff's struggles with research, Vlach said she still didn't understand what his long-term goals were, noting that she and Kalish had raised this concern with plaintiff the preceding year and that's "when the admin stuff came up," yet plaintiff had not seemed to pursue this path.  Vlach posed a number of different career paths and academic options.  Although plaintiff agreed that his first plan of being an R1 professor was not working out and that he had been thinking about other options, he said he felt the best option was for him to finish up and get his Ph.D. from the department and he would "have what [he] need[ed]."

Vlach told plaintiff that she had given the matter a lot of thought but could no longer serve as his advisor because she was not helping him.  She said she had been trying for four years to help plaintiff find his interests and succeed, but from her perspective, he seemed to be lost and simply "floating."  Vlach also said she had serious doubts about plaintiff's ability to pass a preliminary exam based on his lack of depth in understanding the theories relevant to his work in Vlach's lab.  Vlach said she could no longer be his mentor because he needed someone who could help him achieve his goals and she did not understand what he wanted.

Vlach gave plaintiff some practical considerations for locating a new primary mentor and advisor, but said she was not sure whether another mentor in the department would adopt him.  She discussed other practical considerations with him, including applying to graduate programs elsewhere, or simply using his master's degree without obtaining a Ph.D.  Vlach told plaintiff that as his current advisor, it was her position to recommend to the

15

department whether plaintiff should continue on with his Ph.D. Vlach told plaintiff that she had deliberately not checked the box on plaintiff's master's degree warrant which asked for this recommendation, explaining that she would not recommend that he continue unless he found a mentor and clarified his plans with her by the end of the summer. Vlach also advised plaintiff that he could appeal her decision to discontinue as his advisor to the department chair. After this meeting, plaintiff did not speak with any other faculty members in the department in an attempt to secure another advisor.

### G. Plaintiff Complains of Disability Discrimination

On May 24, plaintiff complained of discrimination to Associate Dean Julie Mead in UW-Madison's School of Education. Plaintiff alleged that Vlach had discriminated against him on the basis of his disability by denying him a TA position and later discontinuing as his advisor, after he had requested an accommodation for his disability. Mead recommended that plaintiff address his concerns with the chair of the department, defendant Brown.

On June 10, 2018, plaintiff met with Brown and Associate Dean Carolyn Kelly. Prior to this meeting, Brown was not intimately familiar with plaintiff or his work as a graduate student in the department. During the June 10 meeting, plaintiff alleged that Vlach had used his disability and request for a two-week extension to write his master's thesis as a reason to not select him for a TA position and to discontinue being his advisor. He further stated his belief that his thesis committee had voted to admit him into the Ph.D. program, but that Vlach had overridden that vote. Plaintiff feared that Vlach, and perhaps others, did

not want him to continue in the department because of his disability.

As department chair, Brown took plaintiff's grievance seriously and promptly investigated his concerns. Because plaintiff's thesis committee had not submitted any written recommendation whether plaintiff should continue to work towards his Ph.D., Brown spoke with the three committee members individually. Brown learned that Vlach was not recommending that plaintiff continue. Kalish struggled with how to vote, but ultimately decided that plaintiff should not continue as a Ph.D. student because Kalish was taking a new position and would not be at UW-Madison to support him. Finally, Rosengren, who was not a member of the department, said he did not think he could give a recommendation either way.

Brown discussed with Vlach the reasons she decided she could no longer serve as plaintiff's advisor. Vlach told Brown that she did not think plaintiff was capable of Ph.D-level research, and plaintiff himself acknowledged that he struggled in the program and that his interests and career goals had changed. Vlach told Brown that she and Kalish had worked with plaintiff to connect him with individuals and resources that were more aligned with his passions and stated career goal, which was to work in higher education administration. Vlach explained that she had worked with plaintiff for close to four years to find his passions, but she was out of ideas and did not feel as if she could effectively serve as his advisor any longer.

Brown attempted to find another faculty member who would mentor plaintiff and supervise his work in the event the department voted to permit him to pursue his Ph.D. The

only member willing to do so was Bob Enright.  Although Enright's field of research was different from the work plaintiff had done with Vlach and Kalish, Enright said he would take plaintiff on so long as he understood that their fields did not overlap.  Brown did not tell Enright or any other faculty members that plaintiff had a disability, had previously requested accommodations, or  might need accommodations in the future.

On June 20, 2018, plaintiff met with Brown and Amy Bellmore, then-chair of the Human Development program, in Brown's office.  Brown explained to plaintiff that he had taken his concerns of discrimination seriously and investigated his allegations, but did not find evidence to support his claims.  Brown pointed out that before ever disclosing his disability to anyone in the department, plaintiff had already told Vlach and Kalish that he had a decreased interest in academic teaching and research and an interest in higher education administration, a career plaintiff had also discussed during Brown's meeting with him on June 10.  According to Brown, Vlach identified her lack of expertise in higher education administration as a reason she could no longer serve as his advisor.  He further noted that Vlach and Kalish had attempted to help plaintiff achieve his goals by providing names of individuals they knew in higher education who could help him, and that in fact plaintiff had contacted two of the individuals recommended by Kalish.  Finally, Brown told plaintiff that  Enright was willing to serve as his advisor if the faculty voted to allow plaintiff to pursue his Ph.D., explaining that Enright's expertise differed from Vlach and Kalish's.

Plaintiff sent a follow-up letter to Brown later that day in which he transcribed portions of the conversation and provided rebuttal to some of Brown's statements.  Plaintiff

18

concluded his email by stating that he saw several legal issues, that his damages were $600,000, but that he would settle the matter for $300,000. Brown responded on June 20, 2018, stating that there was no basis to provide plaintiff the financial compensation he requested. Brown reiterated that, subject to faculty approval at the July department meeting, Bob Enright had agreed to serve as plaintiff's advisor for the Ph.D. program and guide plaintiff as best he could in plaintiff's chosen field of interest, and that it was plaintiff's choice whether to accept or reject the offer. Brown reiterated this offer on June 29, 2018, noting that plaintiff did not need to change his research interests to align with Enright's. He further stated that plaintiff was free on his own to find another faculty member in the human development area to serve as his advisor. Brown said plaintiff needed to communicate his decision to Brown before the faculty meeting in July.

Plaintiff responded on June 29, 2018, stating that, to his knowledge, Vlach was still his advisor of record and that he was still willing to continue to work under her, adding that the "alleged illegal conduct does not prevent a professional relationship to the extent necessary for [him] to complete the program with a Ph.D." Brown responded that given the concerns that plaintiff had previously expressed about Vlach, it was not practical to continue working with her and that she was no longer available to serve as his advisor. Brown again told plaintiff to let him know if he accepted Enright's offer to advise him.

Having heard nothing from plaintiff by July 10, 2018, Brown emailed him to remind him that he needed an answer about Enright because the July 16 faculty meeting was coming up. Plaintiff responded that he still had questions about the proposed resolution and that

he was currently working with UW-Madison's Office of Compliance to learn more about their process and potentially file a complaint.  On July 12, plaintiff emailed Brown and Deans Mead and Kelley, posing additional questions about Enright and the process of the faculty voting on plaintiff's admission to the Ph.D. program, including whether the vote could be delayed until September.  Brown responded to plaintiff by email that same day, explaining that the faculty needed to vote by the July 16 faculty meeting to ensure that plaintiff's standing in the graduate program was not affected and that he did not have to reapply for admission.

On July 13, 2018, Associate Dean Mead responded to plaintiff's July 12 email, noting that Brown and Kelley were out of the office but she was available to meet with plaintiff that afternoon.  Plaintiff replied that he was not available to meet until early the following week, but that if anyone could provide him with detailed information via email, he would "try to look through the information this weekend."  Brown emailed plaintiff and attempted to answer the various questions he had raised, including questions about the effects of delaying until September a faculty vote on his admission to the Ph.D. program.  Later that day, plaintiff accepted the department's offer to have  Enright serve as his advisor, but made it clear that he was not relinquishing his prior allegations and was accepting the offer for purposes of attempting to continue his education and "mitigate possible damages."  In that same email, plaintiff had asked whether it was acceptable to contact Enright directly. Inadvertently, Brown did not respond to this question, but he had no reason to forbid it: students were free to speak with department faculty about any subject without seeking

permission from the chair of the department.  Brown told plaintiff that he would place the issue of his admission to the Ph.D. program on the July 16 faculty meeting agenda and would alert him of the vote as soon as possible afterward.  Plaintiff never spoke with Enright.

## H.  July 16, 2018 Faculty Meeting

At the July 16, 2018 faculty meeting, Vlach did not present a case as to whether plaintiff should be permitted to continue as a Ph.D. student.  According to plaintiff, Kalish told him he would advocate on his behalf at the meeting if plaintiff provided a statement of what he wanted Kalish to say, but plaintiff did not prepare anything.  Instead, Brown provided background information, explaining that Enright had agreed to serve as plaintiff's advisor should the faculty vote to allow him to continue.  After Brown's presentation, at least one faculty member asked whether there was somebody present who could speak to plaintiff's abilities, given that Enright did not have previous experience with plaintiff.  Vlach agreed to answer questions, keeping her responses specific to the questions asked.  When asked about the length of time that plaintiff took to complete his master's, Vlach stated that plaintiff had been slow to learn key concepts and failed to meet important deadlines throughout his time as her advisee.  The faculty voted, 12-1, not to admit plaintiff to the Ph.D. program.  Vlach did not cast a vote.

OPINION

Plaintiff's complaint alleges three claims: (1) he was discriminated against on the basis of his disability when Vlach withdrew as his advisor; (2) he was discriminated against on the basis of his disability when the department chose not to award him a TA position for the 2018-19 academic year; and (3) he was retaliated against when the department voted on July 16, 2018, not to allow him to continue with his Ph.D. Summary judgment on plaintiff's claims is appropriate if the moving party shows there is "no genuine dispute as to any material fact," and that he is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(a). To avoid summary judgment, plaintiff "must set forth specific facts showing that there is a genuine issue for trial," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and "produce sufficient admissible evidence, taken in the light most favorable to [her], to return a jury verdict in his favor." Fleishman v. Cont'l Cas. Co., 698 F.3d 598, 603 (7th Cir. 2012). A court may consider only admissible evidence in assessing a motion for summary judgment. Gunville v. Walker, 583 F.3d 979, 985 (7th Cir. 2009).

## A. Disability Discrimination

The Rehabilitation Act precludes federal grantees from excluding, denying benefits to, or discriminating against any "otherwise qualified individual . . . solely by reason of her or his disability." 29 U.S.C. § 794(a). Title II of the ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public

entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The Court of Appeals for the Seventh Circuit has declared that the discrimination provisions and regulations of both statutes are "materially identical" and "coextensive."  A.H. by Holzmueller v. Ill. High Sch. Ass'n, 881 F.3d 587, 592 (7th Cir. 2018); Washington v. Ind. High Sch. Athletic Ass'n, Inc., 181 F.3d 840, 846 (7th Cir. 1999).  To establish a discrimination claim, plaintiff must prove three elements:  (1) he is disabled; (2) he was otherwise qualified; and (3) he was terminated from a program or service of the public entity because of his disability.  Khan v. Midwestern Univ., 879 F.3d 838, 843 (7th Cir. 2018), as amended on denial of reh'g (Feb. 26, 2018).

To establish the third element, plaintiff must show that he would not have suffered adverse actions "but for" his disability.  Hooper v. Proctor Health Care Inc., 804 F.3d 846, 853 (7th Cir. 2015).  The ultimate question is whether a reasonable jury could find that plaintiff would not have suffered the adverse actions of which he complains if he was not disabled and everything else had remained the same.  Graham v. Arctic Zone Iceplex, LLC, 930 F.3d 926, 929 (7th Cir. 2019); see also Ortiz v. Werner Enterprises, Inc., 834 F.3d 760 (7th Cir. 2016) ("Th[e] legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [disability] caused the discharge or other adverse employment action.  Evidence must be considered as a whole").  The Rehabilitation Act further requires that a plaintiff show that the program in which he was involved received federal financial assistance.  29 U.S.C. § 794(a); Novak v. Bd. of Trs. of S. Ill. Univ., 777 F.3d 966, 974 (7th Cir. 2015).

23

In this case, the defendant Board concedes that it receives federal funding and that plaintiff suffers from a disability.  The parties dispute whether plaintiff was qualified to continue as a Ph.D. student in Vlach's lab, but it is not necessary to address that issue because plaintiff's claim falters on the third element: causation.  To show causation, plaintiff must present evidence permitting an inference that defendant's actions were based on his disability rather than some other legitimate reason. Such evidence "can consist of evidence that similarly situated nondisabled persons received more favorable treatment or some other evidence permitting an inference of discrimination."  Timmons v. General Motors Corp., 469 F.3d 1122, 1129 (7th Cir. 2006).

Plaintiff has presented no evidence of similarly situated comparators or any "direct" evidence of discrimination such as stray remarks or admissions by defendants.  Instead, he attempts to raise an inference of discrimination by showing that defendants' stated, non-discriminatory reasons for their actions were phony.  As explained below, he falls far short of meeting his burden.

1. Vlach's May 23, 2018 decision

In her conversations with plaintiff and Brown, Vlach identified the following reasons for her decision to withdraw as plaintiff's advisor:  (1) he struggled with key concepts within the field and did not seem to be improving; (2) he did not seem passionate about his work or the prospects of working within Vlach's area of expertise; (3) he expressed an interest in higher education administration, an area in which Vlach lacked expertise; (4) Vlach did not

24

believe he could pass a preliminary exam in her area of expertise based on his lack of depth in understanding the theories relevant to the work he had done in her lab; and (5) plaintiff seemed to be "lost" and "floating" and Vlach was out of ideas how to help him.  To show that these reasons are pretextual, plaintiff must present evidence to suggest that Vlach is lying.  Skiba v. Ill. Cent. Railroad Co., 884 F.3d 708, 724 (2018) (citations omitted).  "To meet this burden, [plaintiff] must 'identify such weaknesses, implausibilities, inconsistencies, or contradictions' in [defendant's] asserted reason[s] 'that a reasonable person could find [them] unworthy of credence.'"  Id. (citing Coleman v. Donahue, 667 F.3d 835, 852 (7th Cir. 2012)).

Plaintiff contends that Vlach's reasons for withdrawing as his advisor are dubious for multiple reasons, none of which is persuasive.  First, he disputes Vlach's assessment of his work and his ability to pass a preliminary exam in her field of research.  He says Vlach never expressed such doubts before their May 23, 2018 meeting, and that she had in fact given him "feedback" to the contrary.  However, the only evidence plaintiff offers of this "feedback" are annual progress letters from the department stating that he was making "satisfactory" progress towards his degree.  These brief, *pro forma* letters say nothing of plaintiff's abilities or depth of understanding of the theories he was studying in Vlach's lab.

On the other hand, the various emails exchanged among plaintiff, Vlach, and Kalish as he was writing his thesis in late 2017 and early 2018 show that Vlach had concerns about plaintiff's work quality and passion for his research, so much so that she and Kalish made it a special topic of their meeting with him on January 23, 2018, before they even knew he

had a disability.  No reasonable jury could find from this evidence that Vlach's concerns about plaintiff's performance appeared from out of the blue.  <u>Cf.</u> <u>Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't</u>, 510 F.3d 681, 692 (7th Cir. 2007) (jury could find employer's performance-related reasons for firing an employee were not believable because the employer hadn't raised performance concerns with anyone, including the employee or other supervisors, until the employee took legal action).

Plaintiff also denies saying he was not passionate about research or teaching, and says he expressed interest in higher education administration only as a "backup plan."  Once again, however, his own statement is insufficient to create a genuine dispute of fact. Plaintiff's own career plan document, which identifies "University Administrator in Academic Affairs" as his career goal and which states that he "will not be an R1 professor," makes it clear that he was not passionate about becoming an R1 researcher or professor in the field of categorization and was interested in a different career path and that Vlach was aware of this.  Further, plaintiff began to explore a career in that area, meeting with one of the individuals in higher education administration whom Kalish had recommended.  Finally, as Vlach noted in her January 13, 2018 email to Kalish, plaintiff's difficulties in making forward progress on his master's thesis suggested that he was not enjoying his work.  Perhaps Vlach was mistaken about plaintiff's desires and intentions, but "faulty reasoning or mistaken judgment" is not enough to show pretext.  <u>Argyropoulos v. City of Alton</u>, 539 F.3d 724, 736 (7th Cir. 2008).

Plaintiff also devotes much of his presentation to refuting any suggestion that he was

behind the department's expected timeline for earning his master's and eventual Ph.D. degrees. He submits a "Time to Degree" chart, apparently produced by the UW-Madison Graduate School Office, showing that during the years 2010-2019, approximately 20 percent of students who obtained a master's degree in Educational Psychology took more than three years to do so. Dkt. #29-2. Although defendants raise various objections to the admissibility of this chart, it is unnecessary to rule on them because this evidence is immaterial. Although Vlach told plaintiff that he was "behind" in his research skills, Vlach did not cite plaintiff's delay in the program as a reason for discontinuing as his advisor. In fact, even as of March 2018, when plaintiff was already behind schedule, Vlach and Kalish offered to remain plaintiff's "advisors on paper" if he could find a primary mentor that better aligned with his career interests. Thus, the record fails to support his suggestion that he was treated adversely simply because he failed to complete his master's degree in the recommended six semesters.

Finally, plaintiff has no evidence to suggest that Vlach did not genuinely perceive plaintiff as someone who was "lost" about what he wanted and that she was out of ideas to help him. Plaintiff suggests that Vlach's lack of understanding of his career goals and how earning his Ph,D. in her lab could fit within those goals was a failure on her part. Maybe so. But the ADA and Rehabilitation Act do not prohibit misguided or misinformed decisions, only deliberately discriminatory ones. Plaintiff has adduced no evidence to suggest that Vlach's assessment did not reflect her honest opinion, which is amply supported by her emails and conversations with plaintiff.

27

As the Court of Appeals for the Seventh Circuit has observed, academic judgments often rest on necessarily "subjective judgments about academic potential" and that courts should be careful about second-guessing them.  Novak, 777 F.3d at 976; Khan, 879 F.3d at 844 ("Academic decisions, such as whether a student is qualified for, or entitled to promotion within a program, must be left to the broad discretion of the academic institution.").  Plaintiff has presented no evidence that warrants second-guessing that judgment in this case.   Accordingly, summary judgment is warranted on this claim.

2.  Failure to offer plaintiff a TA position for the 2018-2019 academic year

Defendant's purported, legitimate, non-discriminatory reasons for not offering plaintiff a TA position in the Human Development program for the 2018-19 academic year are the following:  (1) plaintiff was behind on his timeline for defending his master's thesis; (2) he had already served as a TA twice; (3) he had a good history of funding; and (4) TA positions are usually awarded to students in the early, rather than late, stages of their graduate program.  Once again, to defeat summary judgment, plaintiff must adduce evidence from which a jury could find that defendant's stated reasons were "[a] lie, specifically a phony reason for some action."  McCann v. Badger Mining Corp., 965 F.3d 578, 589 (7th Cir. 2020).

Plaintiff has not met his burden.  The "Time to Degree" chart, which he claims demonstrates that some students take longer than three years to earn their master's, does not raise an inference that the department was lying when it said he was "behind the timeline."

28

Notably, plaintiff does not dispute that: (1) the department generally expects its students to defend their master's thesis by the end of the third year; (2) the department chair recommended that plaintiff defend his thesis in the spring/summer of 2017; and (3) plaintiff had set his own deadline of August 2017. By any of these measures, plaintiff was "behind the timeline for the program," as Vlach stated in her May 13, 2018 email.

Moreover, plaintiff's slow progress in the program was only one of the reasons plaintiff was not offered a TA position. Other factors included his previous TA experience, his good history of funding, and his being in a later stage of his graduate career. Plaintiff has not adduced any evidence to contest the accuracy of these facts or to suggest that the department did not actually consider these factors in denying him a TA position, so he has not raised an inference of pretext. Because plaintiff has failed to adduce any evidence from which a jury could conclude that he would have been offered a TA position if he were not disabled and everything else had remained the same, summary judgment is appropriate on this claim.

## B. Retaliation

The ADA provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." 42 U.S.C. § 12203(b). To survive summary judgment on his retaliation claim,

plaintiff must offer evidence that "[the plaintiff] engaged in protected activity, that [he] suffered an adverse action, and that there is a causal connection between the two." Rowlands v. United Parcel Serv. - Fort Wayne, 901 F.3d 792, 801 (7th Cir. 2018).  The retaliation must be "a but-for" cause of the adverse action.    Serwatka v. Rockwell Automation, Inc., 591 F.3d 957, 963 (7th Cir. 2010).

Plaintiff's retaliation claim fails because he has failed to demonstrate a causal connection between his complaints against Vlach and the faculty's refusal to admit him to the Ph.D. program.  First, plaintiff presents no evidence that any faculty members present at the July 16, 2018 meeting other than Vlach and Brown knew of his complaints.  Long v. Teachers' Ret. Sys. of Ill., 585 F.3d 344, 351-52 (7th Cir. 2009) (noting that "a plaintiff must generally provide evidence that the decisionmaker acted for a prohibited reason to establish a prima facie case of retaliation").  Second, although plaintiff suggests in his complaint that Brown sabotaged his chances of a favorable vote by offering him an obviously "inappropriate" advisor in Dr. Enright and then "refusing" to allow plaintiff to speak to Enright before the July 16, 2018 faculty meeting, the undisputed evidence shows that Enright was the only faculty member willing to advise plaintiff and Brown never forbade plaintiff from speaking with him.  Plaintiff did not meet with Enright or strive on his own to find any other faculty member who could advise him, even though Vlach made it clear to him after his thesis defense that she would not recommend him for admission to the Ph.D. program unless he clarified his goals and found a new mentor.  Finally, plaintiff admits that Kalish offered to advocate for him at the faculty meeting if plaintiff prepared remarks for

him to present, but plaintiff did not prepare anything.  Given these undisputed facts, no reasonable jury could find that it was Brown's fault that plaintiff had no one to advocate for him at the faculty meeting, much less that any of Brown's actions were motivated by retaliatory intent.    In his brief, plaintiff asserts that "Brown's actions and statements represented a sharp departure from the Graduate Handbook procedures, normal practices observed by [plaintiff], representations from Vlach, and any notion of a process providing reasonable opportunity for [plaintiff] to be successful." Dkt. #30, at 11.  However, plaintiff fails to elaborate on this broad statement or cite any specific facts to support his assertions. Notably, he does not explain how Brown's actions departed from the handbook, what "normal practices" plaintiff observed, or what "process" he thinks Brown should have followed.  Accordingly, he has not created a genuine dispute of fact concerning Brown's actions that would permit a jury to infer causation.  Defendants are therefore entitled to summary judgment on plaintiff's retaliation claim.

## ORDER

IT IS ORDERED that:

1.    Plaintiff Nigel Noll's motion for leave to file a supplemental declaration, dkt. # 36, is DENIED.

2.    The motion of defendants Board of Regents of the University of Wisconsin System, Dr. B. Bradford Brown and Dr. Haley Vlach for summary judgment, dkt. # 19, is GRANTED.

31

3.      The clerk of court is to enter judgment for defendants and close this case.


Entered this 8th day of November, 2021.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge